UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JACQUELINE MARIE JOHNSON,

        Plaintiff,        Civil Action No. 13-12139
                           Honorable Arthur J. Tarnow
                           Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [9, 10]**

Plaintiff Jacqueline Marie Johnson ("Johnson") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [9, 10], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.    RECOMMENDATION**

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Johnson is not disabled under the Act. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [10] be GRANTED, Johnson's Motion for Summary Judgment [9] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decision be AFFIRMED.

**II.     REPORT**

   **A.     Procedural History**

On December 23, 2009, Johnson filed applications for DIB and SSI, alleging a disability onset date of December 1, 2008. (Tr. 154-61). These applications were denied initially on May 27, 2010. (Tr. 84-91). Johnson filed a timely request for an administrative hearing, which was held on June 14, 2011, before ALJ Troy Patterson. (Tr. 43-61). Johnson, who was represented by attorney Mikel Lupisella, testified at the hearing, as did Johnson's Community Mental Health case manager, Amanda Lizotte, and vocational expert Stephanee Leech. (*Id.*). On October 11, 2011, the ALJ issued a written decision finding that Johnson is not disabled. (Tr. 31-39). On March 15, 2013, the Appeals Council denied review. (Tr. 1-6). Johnson filed for judicial review of the final decision on May 15, 2013. (Doc. #1).

   **B.     Background**

      *1.     Disability Reports*

In an undated disability report, Johnson indicated that her ability to work is limited by panic, anxiety, severe depression, and agoraphobia. (Tr. 180). According to Johnson, her conditions became severe enough to keep her from working on December 1, 2008, and she has not worked since that time. (*Id.*). At the time of the report, she was taking Klonopin, Paxil, and trazadone for depression. (Tr. 183).

In a function report dated March 14, 2010, Johnson reported that she lives in a house with her children. (Tr. 219). When asked to describe her daily activities, Johnson indicated that she drives her children to and from school, does laundry, prepares meals, and assists her children with homework. (*Id.*). She is able to care for her two children (who were then sixteen and six years old, respectively) and her pets. (Tr. 220). Her conditions affect her sleep, as she "can't turn off [her] brain" and experiences racing thoughts. (*Id.*). However, she has no problem with

2

personal care. (*Id.*). She is able to prepare meals and do housework on a daily basis. (Tr. 221). She is able to drive, but she only goes out when she must; after she was a victim of a robbery, she became very afraid and now suffers panic and anxiety attacks when in public. (Tr. 222). She is able to pay bills, count change, and handle a checking/savings account. (*Id.*). Her hobbies include sewing, reading, and watching sports, although it is more difficult for her to focus now on these activities. (Tr. 223). She spends time with others (on the phone and in person), but she does not go anywhere on a regular basis. (*Id.*).

When asked to identify functions impacted by her condition, Johnson checked concentration and getting along with others. (Tr. 224). She cannot pay attention for very long, does not finish what she starts, and has trouble following written instructions. (*Id.*). In addition, she has difficulty handling stress and changes in routine and is afraid of other people. (Tr. 225).[1]

### 2. *Hearing Testimony*

At the time of the June 14, 2011 hearing before the ALJ, Johnson was 38 years old and lived in an apartment with her children (who were then ages 17 and 7). (Tr. 49-50). She graduated from high school and took some college classes but did not obtain a degree. (Tr. 49). She testified that she has difficulty concentrating and often has to re-read things several times before she understands them. (Tr. 53). She is able to drive and shop for groceries, but she does so during "odd hours" (generally, early in the morning) because she "can't handle being around so many people." (Tr. 50-52). On occasion, she has run out of the grocery store, leaving her cart behind, because she felt that there were too many people there. (*Id.*). Johnson further testified that she is able to perform housework, but her older son helps with this, especially during her

---

[1] In written correspondence, Johnson's mother, Barbara Washington, older son, Marquan Carpenter, and former colleague, Bethany Lanier, generally corroborated Johnson's allegations that, after she was robbed at gunpoint, she began experiencing anxiety and panic attacks. (Tr. 207-14).

"roughest periods" (when she locks herself in her bedroom to "take a break"). (Tr. 51). She has difficulty sleeping; she checks her front door every half hour to make sure it is locked. (*Id.*). At the time of the hearing, Johnson claimed she had not slept in four nights. (*Id.*).

Johnson's Community Mental Health case manager, Amanda Lizotte, also testified at the administrative hearing. (Tr. 57-60). Ms. Lizotte testified that she had known Johnson for approximately one year, and saw her twice a month. (Tr. 58). Together with Johnson's psychiatrist, Ms. Lizotte was responsible for assessing and monitoring Johnson's medications, psychiatric stability, physical health, and housing benefits. (*Id.*). Ms. Lizotte testified that she went to Johnson's apartment for each appointment, because Johnson became too anxious at the thought of being around other people in the office's waiting room. (Tr. 59-60).

### 3. Medical Evidence

The ALJ found that Johnson suffers from the severe impairments of panic disorder, posttraumatic stress disorder, bipolar disorder, personality disorder, and depression. (Tr. 33). Medical evidence pertaining to these conditions is discussed below.

#### (a) Treating Sources

Johnson and her husband sought marital counseling at Genesys Hillside Center for Behavioral Services ("Genesys") on June 17, 2008. (Tr. 231-25). At that time, Barbara Jubar, L.M.S.W., Johnson's treating therapist, noted that Johnson's mood was depressed and she complained of concentration problems, but her thought process and memory were intact, she was fully oriented, and her speech was logical. (Tr. 233). Johnson was diagnosed with depressive disorder and assigned a Global Assessment of Functioning[2] ("GAF") score of 56. (*Id.*). Johnson

---

[2] GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

had two subsequent medication evaluations with Dr. Purna Surapaneni at Genesys in 2008, and she attended two follow-up therapy sessions with Ms. Jubar (on June 24, 2008 and October 9, 2008). (Tr. 244-45, 250-51). At an October 28, 2008, reassessment appointment, Ms. Jubar noted that Johnson was "well-groomed and nicely dressed but said, 'I've been a nervous wreck. I'm worse than last time.'" (Tr. 236). Ms. Jubar again diagnosed Johnson with depressive disorder and assigned her a GAF score of 56. (Tr. 237).

Johnson saw Dr. Surapaneni again on April 21, 2009, at which time Johnson indicated that she had been laid off from her job at a local accounting firm two months earlier. (Tr. 252). Dr. Surapaneni's note states that Johnson had "not been in to see me in six months. She said that she lost her insurance benefits and she could not afford to come here." (*Id.*) She further indicated that she had a part-time job offer at Sears and was scheduled for orientation the following day. (*Id.*). On April 30, 2009, Johnson had a reassessment appointment with Ms. Jubar, who noted that she "often misses appointments and avoids follow through." (Tr. 240). Johnson reported having "extremely horrible panic attacks" and said that she was "almost paralyzed with fear." (*Id.*). Johnson indicated that she wanted the "high anxiety and panic attacks to stop," and Ms. Jubar stressed the need for her to regularly attend therapy appointments, noting that her "track record has been poor in this area." (*Id.*). Johnson's diagnoses again were depressive disorder and panic disorder with agoraphobia, and her GAF score was 54. (Tr. 241).

At a May 14, 2009 therapy appointment, Johnson reported that she was "deeply depressed" and had had suicidal thoughts. (Tr. 247). The next week, Johnson again indicated that she continued to have suicidal feelings at times but said she would never do anything to harm herself. (Tr. 248). After that, it appears that Johnson did not return to Genesys until December 23, 2009, at which time she saw Dr. Surapaneni for a medication evaluation. (Tr.

253). Dr. Surapaneni noted that Johnson had not been in to see him in eight months and had "chronic poor compliance." (*Id.*). Johnson was subsequently discharged from Genesys for "non-compliance with treatment plan." (Tr. 324-25).

Johnson then began treating at Genesee County Community Mental Health ("CMH"). (Tr. 267-83). A December 16, 2009 psychosocial assessment indicates that Johnson was not suicidal or homicidal, but that her past behavior included one suicide attempt. (Tr. 272). On mental status examination, her thought content was in the normal range; she had no hallucinations; her thought process was logical and coherent; she was fully oriented; and her memory was intact. (Tr. 275). However, Johnson indicated that she was afraid to leave the house or to be in crowds. (Tr. 279). She was diagnosed with major depressive disorder, bipolar I disorder, and panic disorder with agoraphobia and assigned a GAF score of 58. (Tr. 280).

Between December 2009 and late June 2010, the record contains no evidence of mental health treatment. On June 23, 2010, Johnson saw Dr. Gerald Pope at CMH for a medication review. (Tr. 318-22). He indicated that Johnson had filed for divorce from her husband and seemed "enraged and agitated" when talking of her life events. (Tr. 319). She was diagnosed with major depressive disorder, bipolar I disorder, panic disorder without agoraphobia, and generalized anxiety disorder and assigned a GAF score of 61. (Tr. 321).

Johnson then saw Robin Fenlon, L.M.S.W., at CMH on a few occasions in July, August, and September 2010. On July 21, 2010, Ms. Fenlon noted that Johnson was oriented times three, well groomed, and denied any suicidal or homicidal thoughts. (Tr. 314). On August 26, 2010, Ms. Fenlon noted that Johnson was oriented times four and alert, and she denied any suicidal intent or pressure to act on suicidal thoughts. (Tr. 305-06). On September 23, 2010, Johnson saw Ms. Fenlon and asked to be hospitalized, saying she was having suicidal thoughts. (Tr.

6

300). On November 12, 2010, Johnson was discharged from CMH for non-participation. (Tr. 296). Her diagnoses were posttraumatic stress disorder, major depressive disorder, and panic disorder with agoraphobia, and her GAF score was 55. (Tr. 299).

*(b)    Consulting and Non-Examining Sources*

On May 17, 2010, Matthew Dickson, Ph.D., performed a consultative psychological examination. (Tr. 291-94). Johnson complained of anxiety, posttraumatic stress disorder, agoraphobia, and severe depression. (Tr. 291). She indicated that she had last worked in a temporary position as an office manager, but said that her husband "would not allow her to work." (*Id.*). Johnson also indicated that she had anxiety whenever she left her home. (*Id.*). She reported taking Paroxetine and Clonazepam, but indicated that she had not been attending mental health treatment sessions. (*Id.*). She reported "generally getting along OK with people she knows," but said that she does not reach out to people and stays away from crowds. (Tr. 292). She further indicated that, while employed, her interactions with others were satisfactory. (*Id.*). According to Dr. Dickson, Johnson was "quietly dramatic" during the examination, but basically socially appropriate. (*Id.*). Johnson indicated that she was able to cook, clean, and do laundry, and was independent in self-care and personal hygiene. (*Id.*). It was Dr. Dickson's subjective impression that Johnson "exaggerated symptoms [] and under-represented her functioning ability," saying that she "conveyed a strongly woeful and self-sympathetic attitude, which seemed exaggerated." (*Id.*). Later in his report, Dr. Dickson described Johnson's affect as normal, saying again that she "seemed to exaggerate her emotional presentation today." (Tr. 293). Dr. Dixon diagnosed Johnson with anxiety disorder, depressive disorder, and personality disorder; characterized her prognosis as "guarded"; and assigned her a GAF score of 57. (Tr. 294). He further indicated:

7

> It is my impression that Jacqueline's mental abilities to understand, attend to, remember, and carry out instructions are not impaired. Jacqueline's abilities to respond appropriately to co-workers and supervision and to adapt to change and stress in the workplace are moderately impaired.
>
> Overall, based on today's exam and all the information available to me at this time, it is my impression that Jacqueline's psychological condition would moderately impair her ability to perform work related activities.

(*Id.*).

On May 26, 2010, state agency medical consultant Dennis Beshara, M.D., reviewed Johnson's records and completed a mental RFC assessment and a Psychiatric Review Technique. (Tr. 65-69). Dr. Beshara noted that Johnson suffers from an affective disorder (as defined in Listing 12.04), an anxiety disorder (as defined in Listing 12.06), and a personality disorder (as defined in Listing 12.08). (*Id.*). He opined that Johnson is mildly limited in her activities of daily living and social functioning, and moderately limited in maintaining concentration, persistence, and pace. (Tr. 66). Dr. Beshara concluded that Johnson remains capable of unskilled work. (Tr. 69).

### 4. *Vocational Expert's Testimony*

Stephanee Leech testified as an independent vocational expert ("VE") at the administrative hearing before the ALJ. (Tr. 55-57, 60). First, the VE testified that Johnson's past relevant work as a retail manager was skilled in nature and performed at the light exertional level. (Tr. 55). Then, the ALJ asked the VE to imagine a claimant of Johnson's age, education, and work experience, who could perform work at all exertional levels, but with the following nonexertional limitations: she must work in an environment that requires only occasional interpersonal contact with co-workers and the public, with no production rate pace work, and only occasional changes in the routine work setting. (*Id.*). The VE testified that the hypothetical individual would not be capable of performing Johnson's past relevant work. (*Id.*). However,

the VE further testified that the hypothetical individual would be capable of working as a material handler (200,000 jobs nationally), packer (120,000 jobs), or in a food preparation position (100,000 jobs). (Tr. 55-56).

### C. Framework for Disability Determinations

Under the Act, SSI and DIB are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing

20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D. The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Johnson is not disabled under the Act. At Step One, the ALJ found that Johnson has not engaged in substantial gainful activity since December 1, 2008, her alleged onset date. (Tr. 33). At Step Two, the ALJ found that Johnson has the severe impairments of panic disorder, posttraumatic stress disorder, bipolar disorder, personality disorder, and depression. (*Id.*). At Step Three, the ALJ found that Johnson's impairments do not meet or medically equal a listed impairment. (Tr. 33-35).

The ALJ then assessed Johnson's residual functional capacity ("RFC"), concluding that she is capable of performing the full range of work at all exertional levels, with the following nonexertional limitations: she is limited to working in an environment that provides only occasional interpersonal contact with coworkers and the public; no production rate pace work; and only occasional changes in the routine work setting. (Tr. 35-38).

At Step Four, the ALJ determined that Johnson is unable to perform her past relevant work as a retail manager. (Tr. 38). At Step Five, the ALJ concluded, based in part on the VE's testimony, that Johnson is capable of performing a significant number of jobs that exist in the national economy. (Tr. 38-39). As a result, the ALJ concluded that Johnson is not disabled under the Act. (Tr. 39).

**E.	Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human*

*Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

**F.     Analysis**

Johnson argues that, in concluding she was capable of performing a significant number of jobs that exist in the national economy, the ALJ failed to adequately assess the credibility of her subjective complaints and to properly evaluate all of the medical evidence submitted. As a result, Johnson argues, the ALJ failed to pose a hypothetical question to the VE that adequately took into account all of her limitations. A review of the record and the ALJ's decision, however, makes clear that the ALJ committed no error warranting remand.

1. *The ALJ's Credibility Determination is Supported by Substantial Evidence*

As the Sixth Circuit has held, determinations of credibility related to subjective complaints of pain rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'" *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981) (quoting *Beavers v. Sec'y of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)). Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). The ALJ is not simply required to accept the testimony of a claimant if it conflicts with medical reports and other evidence in the record. *See Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531

(6th Cir. 1997). Rather, when a complaint of pain or other symptom is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, he must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians … and any other relevant evidence in the case record" to determine if the claimant's claims regarding the severity of her symptoms are credible. *Soc. Sec. Rul.* 96-7, 1996 WL 374186, at *1 (July 2, 1996); *see also* 20 C.F.R. §416.929.

In this case, after finding at Step Two that Johnson has severe mental impairments (Tr. 33), the ALJ concluded that Johnson has the residual functional capacity to perform the full range of work at all exertional levels, so long as there is only occasional interpersonal contact with coworkers and the public, no production rate pace work, and only occasional changes in the routine work setting. (Tr. 35-38). In reaching this conclusion, the ALJ specifically referenced Johnson's testimony that she "cannot handle being around a lot of people" and "has problems concentrating." (Tr. 36). However, the ALJ found that while Johnson's conditions could reasonably be expected to produce the alleged symptoms, her statements about the intensity, persistence and limiting effects of those symptoms were not entirely credible to the extent they conflicted with the RFC assessment. (*Id.*). In reaching this conclusion, the ALJ specifically considered the medical evidence, as well as Johnson's history of noncompliance with treatment, and he gave good reasons for discrediting Johnson's allegations of work-preclusive limitations. (Tr. 36-38).

In evaluating the credibility of Johnson's allegations, the ALJ noted her history of noncompliance with mental health treatment. (Tr. 33). Specifically, the ALJ noted that Barbara Jubar, Johnson's treating therapist at Genesys, indicated that Johnson "often missed

13

appointments and avoided follow through." (Tr. 36, 240). At a later session, Ms. Jubar stressed the need for Johnson to regularly attend therapy appointments and noted that her "track record has been poor in this area." (Tr. 240). The ALJ also pointed out that, in December 2009, Dr. Surapaneni noted that Johnson had "chronic poor compliance." (Tr. 37, 253).[3] Subsequently, Johnson was discharged from Genesys for "non-compliance with treatment plan." (Tr. 324-25). Similarly, though Johnson sought treatment at CMH in 2010, the ALJ noted that she was discharged from that program as well for non-participation. (Tr. 37, 296). The record contains no satisfactory explanation for Johnson's continued failure to follow through with mental health treatment and, as such, the ALJ did not err in considering her noncompliance with treatment. *See Soc. Sec. Rul.* 96-7p, 1996 WL 374186, at *7 (July 2, 1996) ("An] individual's statements may be less credible … if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure.").

In addition, the ALJ considered the medical evidence of record when evaluating the credibility of Johnson's allegations that she could not be around others or comprehend things. Specifically, with respect to Plaintiff's assertions that she could not be around people, the ALJ considered Johnson's treatment with social worker Barbara Jubar, as well as Dr. Dickson's opinion. (Tr. 36-37). In July 2008, Ms. Jubar noted that one of Johnson's strengths was that she had friends. (Tr. 233). None of Ms. Jubar's treatment notes mention anything about Johnson's inability to handle being in large groups of people. (Tr. 231-48). The ALJ also considered Johnson's statements to Dr. Dickson, the consultative examining psychologist, that she "generally [gets] along OK with people she knows … [but] does not reach out to people and

---

[3] The Court also notes Dr. Surapaneni's April 21, 2009 treatment record which indicates that Johnson blamed her failure to see the doctor in many months not on a mental or physical inability to leave her home, but rather on the fact that she had "lost her insurance benefits and she could not afford to come here." (Tr. 252).

stays away from crowds." (Tr. 37, 292). Johnson told Dr. Dickson that she spent time with her children, cousin, and a girlfriend, and indicated that her interactions with others were satisfactory while she was employed. (Tr. 292). Moreover, Dr. Dickson noted that Johnson was socially appropriate during the examination, and repeatedly indicated his impression that she exaggerated her symptoms and under-represented her functioning ability. (*Id.*).

On the other hand, the ALJ noted objective evidence indicating that Johnson had some difficulty being around crowds. (Tr. 35-38). For example, the ALJ considered a December 2009 CMH psychosocial assessment where Johnson noted she was afraid to leave the house or to be in crowds. (Tr. 36, 279). The ALJ then reasonably accommodated Johnson's fear of being around large groups of people by limiting her to only occasional interpersonal contact with coworkers and the public. (Tr. 35). The ALJ's RFC finding in this respect is consistent with Dr. Dickson's opinion that Johnson is only moderately limited in her ability to respond appropriately to coworkers and supervision (an opinion that Johnson has not challenged). (Tr. 34, 294).

The ALJ also considered Johnson's complaints that she had concentration problems, including her testimony that she had to reread things several times before she understood them. (Tr. 34, 53). Although the ALJ recognized the existence of Johnson's concentration-related difficulties, he reasonably concluded that they were not disabling. In reaching that decision, the ALJ noted Johnson's statements to Dr. Dickson that she could sew on a daily basis and could pay bills and count money, all activities requiring some degree of concentration. (Tr. 34, 292). Similarly, the ALJ noted Johnson's testimony that she is able to drive. (Tr. 34). The ALJ also noted that Dr. Dickson found Johnson to be oriented to time, place and person, and that she was able to recall two of three objects after three minutes. (Tr. 34, 292-93). The ALJ also noted that, on multiple occasions, Robin Fenlon, a CMH social worker, found Johnson oriented and alert.

15

(Tr. 37, 305-06, 314). The ALJ accommodated Johnson's concentration-based limitations by precluding her from production rate pace work and allowing only occasional changes in the routine work setting. (Tr. 35).

In sum, the ALJ recognized the duty imposed upon him by the regulations and, in addition to Johnson's own subjective complaints, he considered Johnson's history of noncompliance with treatment and the objective medical evidence in formulating her RFC. As set forth above, the ALJ found that Johnson is capable of performing the full range of work at all exertional levels, so long as there is only occasional interpersonal contact with coworkers and the public, no production rate pace work, and only occasional changes in the routine work setting. (Tr. 35-38). This conclusion is supported by the various pieces of evidence discussed above, including Dr. Dickson's opinion that Johnson's abilities to understand, attend to, remember, and carry out instructions are not impaired, and his opinion that her abilities to respond appropriately to coworkers and supervisors and to adapt to change and stress in the workplace are only moderately impaired. (Tr. 294). In summary, the ALJ's RFC finding is consistent with the medical and other evidence in the record.

### 2. *The ALJ's Hypothetical Questions to the VE were Proper*

Finally, Johnson argues that the ALJ's hypothetical questions to the VE were insufficient because they did not account for all of her limitations. (Doc. #9 at 10-11). An ALJ may rely on the testimony of a VE to determine whether jobs would be available for an individual who has workplace restrictions. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). However, in order for a VE's testimony in response to a hypothetical question to serve as substantial evidence in support of a conclusion that the claimant can perform other work, the question must accurately portray the claimant's physical and mental impairments. *See Ealy v.*

*Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010).

In this case, Johnson argues that the ALJ should have found that she would be off task approximately 20% of the workday (a limitation Johnson's attorney included in one of the hypotheticals he posed to the VE (Tr. 56-57)), and included such a limitation in the hypothetical questions he asked of the VE. (Doc. #9 at 11). However, Johnson identifies no record evidence supporting such a limitation, and the Court could find none. Because the RFC that Johnson can perform work at all exertional levels with certain nonexertional limitations is supported by the substantial evidence discussed above, and because the ALJ's hypothetical to the VE matched that RFC almost verbatim, (*Cf.* Tr. 35 with Tr. 55), the ALJ properly relied on the VE's testimony that Johnson, even with those restrictions, could perform a significant number of jobs.

For all of the foregoing reasons, the Court finds that the ALJ's decision that Johnson is not disabled is supported by substantial evidence.

## III.   CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [10] be GRANTED, Johnson's Motion for Summary Judgment [9] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: January 22, 2014                     s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                             United States Magistrate Judge


### NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific

objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 22, 2014.

> s/Felicia M. Moses
> FELICIA M. MOSES
> Case Manager